CARBO PETROLEUM CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 9524.    Promulgated May 28, 1928.

*Walter C. Fox, Jr., Esq.*, for the petitioner.
*Maxwell E. McDowell, Esq.*, for the respondent.

## OPINION.

TRAMMELL: With respect to the issues remaining for decision here, the petitioner alleges, first, that in computing invested capital for each of the taxable years involved, the respondent erred in deducting the full amount of income and profits-tax liability for the prior years, prorated; and, second, that in computing the amount of dividends paid in excess of earnings, to be excluded from invested capital, the respondent erred in deducting from available earnings the amount of a tentative tax theoretically accrued for each of the said years.

On the first point, the facts in this case bring it squarely within our decision in *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168, and the action of the respondent, in adjusting invested capital on account of the petitioner's income and profits-tax liability for the previous years, is approved, subject to readjustment only to the extent that such deductions from invested capital may be affected by the redetermination of the deficiencies in accordance with this opinion.

The second issue is controlled by our decision in *L. S. Ayers & Co.*, 1 B. T. A. 1135, where we held that the invested capital of a corporation may not be reduced, in determining the extent to which a dividend is paid from current earnings of a year, by a tentative tax theoretically set aside out of such earnings prorated over such year, because the income and profits tax does not become due and payable, and, therefore, does not accrue, until the following year. The respondent on this point is reversed.

The petitioner further alleges that the respondent erred in excluding from invested capital for each of the taxable years the amount of the petitioner's reserve for depreciation of its physical properties in excess of a reasonable and proper allowance for the years prior to 1918.

From 1909 to 1917, inclusive, the petitioner set up a depreciation reserve on the basis of 10 per cent of the remaining cost of its physical properties each year. In 1923, the petitioner determined that its physical properties had an average useful life of 20 years, and that the reasonable and proper rate of depreciation was 5 per cent of the original cost per year. It thereupon filed amended returns for 1918 and subsequent years, taking deductions for depreciation at the flat rate of 5 per cent of original cost per year in lieu of the original deductions claimed and allowed on the basis of 10 per cent of the annual declining balance of cost. The amended returns were accepted by the respondent, and the 5 per cent rate was conceded to be a reasonable and proper rate for said years.

The petitioner now seeks to restore to invested capital for each of the years 1919 and 1920 the amount of $6,441.46, as representing the depreciation taken in the years prior to 1918 in excess of the rate of 5 per cent. The respondent disallowed the petitioner's contention on this point, and excluded said amount from invested capital on the ground that the petitioner had not established by satisfactory evidence that the 5 per cent rate represented the depreciation actually sustained in said prior years. The respondent concedes that if the 5 per cent rate represents the true depreciation sustained, the petitioner's surplus should be adjusted by the amount of reserve which would result from the application of this rate.

At the hearing the petitioner offered the testimony of a witness who for approximately 13 years has had charge of the repairs and maintenance of its physical properties and who, by reason of his personal knowledge and experience, was peculiarly qualified to testify with respect to the actual depreciation sustained. This witness testified substantially to the fact that said assets had been maintained in good condition and were now in good condition; that they had an average useful life of approximately 20 years, with depreciation at a uniform rate, and that there would be practically no salvage value at the end of that period.

From all the evidence before us, we are satisfied that the 5 per cent rate does in fact represent the true depreciation sustained, and have so found. It follows that the amount of $6,441.46 should be restored to surplus for the purpose of computing invested capital for each of the years here involved.

The remaining and principal ground of error assigned by the petitioner pertains also to the action of the respondent in computing

invested capital as affected by depletion. Prior to the years involved in this proceeding, the respondent determined and allowed depletion based on rates varying from about 6 to 12 cents per barrel or more. In closing the years prior to 1918, 10 cents per barrel was finally determined and allowed as the depletion rate. For the years under review, the respondent allowed, as a deduction from income, depletion at the rate of 10 cents per barrel, and for the purpose of invested capital depletion was computed at the rate of 12.4998 cents per barrel. Also, in determining the deficiencies involved herein, the respondent adjusted the petitioner's surplus by deducting therefrom the difference between its depletion reserve, and depletion computed at the rate of 12.4998 cents per barrel for all years from 1909 to 1918, inclusive.

At the hearing the parties stipulated that the cost of petitioner's oil lease acquired in 1909 was $124,998.50; that the net recoverable oil reserve at the date of acquisition was 1,000,000 barrels; that the recoverable oil content in place at March 1, 1913, was 712,699 barrels; that the fair market value of the lease at March 1, 1913, was $89,086.12, which also represents the agreed depleted cost at that date; and that the correct rate of depletion for the years 1919 and 1920, for the purpose of computing deductions from income and for invested capital purposes, was 12.4998 cents per barrel. Thus, no controversy is presented with respect to depletion for the taxable years.

The petitioner contends, however, that the respondent erred in computing invested capital by reducing surplus on the basis of the depletion actually sustained under the stipulated facts during the years from 1909 to the beginning of 1919, and asserts that its surplus may not be reduced beyond the amount of the deductions from income allowed by the taxing statutes on account of depletion for the period from 1909 to 1915, inclusive, plus the depletion reserve set up on its books for the years 1916, 1917, and 1918.

In support of its contention the petitioner cites us to *United States v. Ludey*, 274 U. S. 295; 6 Am. Fed. Tax Rep. 6754, where the court held that, in determining the amount of taxable gain or deductible loss resulting from the sale in 1917 of oil-mining properties, some of which were acquired prior to March 1, 1913, the amount of deductions from income *allowable* under the revenue acts on account of depletion and depreciation must be deducted from cost, without reference to the actual depletion and depreciation sustained. The court said, " Congress doubtless intended that the deduction to be made from the original cost should be the aggregate amount which the taxpayer was entitled to deduct in the several years."

But with respect to the question of depletion for invested capital purposes, as presented in the instant case, we do not think that the

*Ludey* decision is apposite except in so far as it lays down the law as to what depletion is. The Court of Claims had held that depletion of the oil properties should not be considered in determining the gain or loss from the sale of the properties, upon the ground that "the removal of the oil can not be said to have depleted the capital." The Supreme Court in the *Ludey* case, *supra,* said:

We are of the opinion that the revenue acts should be construed as requiring deductions for both depreciation and depletion when determining the original cost of oil properties sold. Congress, in providing that the basis for determining gain or loss should be the cost or the 1913 value, was not attempting to provide an exclusive formula for the computation. The depreciation charge permitted as a deduction from the gross income in determining the taxable income of a business for any year represents the reduction, during the year, of the capital assets through wear and tear of the plant used. The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost. The theory underlying this allowance for depreciation is that by using up the plant a gradual sale is made of it. The depreciation charged is the measure of the cost of the part which has been sold. When the plant is disposed of after years of use, the thing then sold is not the whole thing originally acquired. The amount of the depreciation must be deducted from the original cost of the whole in order to determine the cost of that disposed of in the final sale of properties. Any other construction would permit a double deduction for the loss of the same capital assets.

\* \* \* \* \* \* \*

The depletion charge permitted as a deduction from gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken. The reserves are recognized as wasting assets. The depletion effected by operation is likened to the using up of raw material in making the product of a manufacturing establishment. As the cost of the raw material must be deducted from the gross income before the net income can be determined, so the estimated cost of the part of the reserve used up is allowed.

\* \* \* \* \* \* \*

The proviso limiting the amount of the deduction for depletion to the amount of the capital invested shows that the deduction is to be regarded as a return of capital. \* \* \* In essence, the deduction for depletion does not differ from the deduction for depreciation.

The court in the above case had before it the question of the extent to which the gain or loss on the sale of assets was affected for income-tax purposes by depletion and depreciation; and did not consider to what extent invested capital was affected. The Supreme Court in *Stratton's Independence* v. *Howbert*, 231 U. S. 399; *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503, and other cases arising under the Excise Act of 1909, held that for the purpose of the Corporation Excise Tax Act it was not necessary that provision be made for depletion of mining properties; that Congress had made no such

provision but the court said in *Stratton's Independence* v. *Howbert*, *supra*, "As has been repeatedly remarked the Corporation Tax Act of 1909 was not intended to be and is not in any proper sense an income tax law. * * * For this and other obvious reasons we are little aided by a discussion of theoretical distinctions between capital and income. Such refinements can hardly be deemed to have entered into the legislative purpose."

The *Ludey* case was decided in the light of the decisions under the 1909 Act and the above cited cases under that Act were referred to. That case then may be regarded as an authoritative statement of the nature and purpose of the depletion deduction under the acts levying a tax upon income and for the purpose of determining gain or loss upon the sale of assets subject to depletion. There is in essence no difference between the deduction allowed for depletion and depreciation. *W. S. Bogle & Co.*, 5 B. T. A. 541; *United States* v. *Ludey*, *supra*. Such deductions are allowed in order that at the time of exhaustion of the assets a sufficient aggregate sum will have been set aside to restore the cost of the assets exhausted. In other words, it is a gradual return of capital invested.

Here, however, the issue relates to invested capital as affected by depletion, and not to the ascertainment of gain or loss on the sale of property, which is a materially different problem, governed by materially different principles of law.

In *Entress Brick Co.*, 9 B. T. A. 588, we pointed out that " In the case of assets acquired prior to March 1, 1913, depletion for invested capital purposes and depletion for the purpose of computing the annual deduction from income may be two totally different things, and should never be confused."

In so far as invested capital is concerned the statute makes no specific provision and contains no specific reference to deductions for depletion. Invested capital is to be determined by section 326, which among other things provides that earned surplus may be included in invested capital. In so far as this case is concerned, we are concerned then only with the proper determination of earned surplus to be included in invested capital. In other words, the question really is what is the earned surplus which the statute provides shall be included in invested capital.

Under the Excise Act of 1909 and the Revenue Act of 1913, invested capital was not a factor in computing taxes. Under the Act of 1909, no deduction was allowed from income on account of depletion. Under the Act of 1913, a deduction for depletion in computing taxable income was allowed not to exceed 5 per cent of the gross value of the output. But depletion was actually sustained to the extent that the contents of the mine were being exhausted through mining operations and actual earnings consisted only of those earn-

ings over and above the pro rata capital actually used up in the processes.

In *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215, the court, in considering the matter, said:

The deductions from gross income allowed by that title (Title 2, providing for an income tax) do not refer to invested capital, surplus or undivided profits, and its provisions throw no light upon the meaning of those terms as used in Title 3 providing for an excess-profits tax.

The problem in the instant case arises from the fact that the depletion sustained in the years prior to 1918, as computed on the agreed facts, was not fully written off by the petitioner; that is to say, the depletion charged off was less than the depletion sustained. Substantially the problem was presented in the *Bogle* case, supra, where we said:

The Commissioner made a further reduction of invested capital because the Essanbee Mines Co. failed to take sufficient depletion for the years prior to 1917. The petitioners contend that such an adjustment for prior years is improper because of the fact that no deduction was taken by that corporation and that it has at no time received the benefit of such an adjustment. The petitioners have admitted, however, that depletion was charged off during those years at the rate of 1.39 cents per ton, whereas the proper rate is 1.765 cents per ton. In the *Appeal of Cleveland Home Brewing Co.*, 1 B. T. A. 87, we held that depreciation of tangible property charged off the books of the corporation for prior years would not be disturbed for invested capital purposes without positive evidence that depreciation actually sustained was not written off by the taxpayer. * * * In this case, however, the facts are quite different, inasmuch as the petitioners have admitted that the depletion actually sustained was not written off on the books. Under these circumstances, there can be no question that the surplus of the petitioners should be reduced on account of inadequate depletion for the years prior to the taxable years.

See also *Lightning Creek Oil & Gas Co.*, 9 B. T. A. 1150.

In the case of *Willcuts* v. *Milton Dairy Co.*, *supra*, the issue was whether the taxpayer was entitled to have included in the computation of its invested capital certain undivided profits undiminished by the amount of an operating deficit of prior years. Also, that case arose under the Revenue Act of 1918, and the same provisions of the statute and of the Treasury regulations applicable there apply equally to the case under review. The principle involved in that case, in its last analysis, is essentially the same as the principle here involved, that is, what was the actual earned surplus to be included in invested capital. There is no distinction, in so far as concerns invested capital, between impairment resulting from an operating deficit and impairment resulting from depletion where adequate provision has not been made therefor. If the depletion actually sustained is not charged against surplus, to that extent there is no true earned surplus. What is considered as earnings may in fact be capital because provision

has not been made for the return out of earnings of the capital actually exhausted by the mining processes. If the income is not sufficient to return the sustained depletion, then there is an operating deficit, which the Supreme Court states in the *Milton Dairy Co.* case, *supra*, must be taken from earned surplus.

In the *Milton Dairy Co.* case the court held that, in computing invested capital, the undivided profits should be applied to reduce the impairment which resulted from the operating deficit, and in its opinion said:

Sec. 326 (a) (Revenue Act of 1918) * * * defined the term "invested capital" with certain exceptions not now material, as the actual cash and cash value of other property bona fide paid in for stock or shares, at the time of such payment, and "(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year." Article 838 of Treasury Regulations 45 declared that:

"Only true earned surplus and undivided profits can be included in the computation of invested capital. * * * In the computation * * * full recognition must first be given to all expenses incurred and losses sustained from the original organization of the corporation down to the taxable year. * * * There can of course be no earned surplus or undivided profits until any deficit or impairment of paid-in capital due to depletion, depreciation, expense, losses or any other cause has been made good."

\*  \*  \*  \*  \*  \*  \*

We think that clause (3) relating to "surplus and undivided profits" was correctly interpreted by Article 838 of the Treasury Regulations. * * * We do not think Congress intended that a corporation whose capital was impaired should be entitled to treat profits that, though earned, were insufficient to make good the impairment and create a surplus, as "undivided profits." This would not only give the term "undivided profits" a meaning entirely at variance with ordinary usage—making it merely equivalent to any earned profits remaining in the business—but would grant the privilege of twice disregarding the impairment of capital, that is, once in computing the paid-in capital, which under the express terms of the Act was to be taken at the full cash or money value at the time of payment, and again in computing the "undivided profits." This term is entirely inapt to express such a purpose.

In the case of the *Cortez Oil Co.* v. *United States*, 64 Ct. Cls. 390, the court decided that invested capital should be reduced by the depletion actually sustained. The court said:

It is apparent that invested capital may be increased by the addition of earned surplus and undivided profits. The regulations of the bureau point out that only "true-earned surplus and undivided profits can be included in the computation of invested capital", and in computing earned surplus and undivided profits reasonable allowances for depreciation and depletion are made. See articles 838 and 839, Regulations 45, 1920 edition. As pertinently observed in the defendant's brief, "the regulations treat these items as an impairment of capital which must be made good before there can be any surplus or undivided profits." The Commissioner must under section 312 ascertain invested capital, and the regulations cited above have been in force and followed by the bureau since the first enactment of the statute, and were so in force, observed and followed when the Revenue Act of 1921 was enacted. *Komada & Co.* v. *United States*, 215 U. S. 392. See also, *United States* v. *Ludey*, 274 U. S. 295.

If the contention of the petitioner be accepted in principle, the effect would be to duplicate the invested capital represented by the same investment. The amount originally invested is not involved here. When the mine is purchased the investment ordinarily represents paid-in capital which is not reduced by depletion and which amount remains in invested capital unless and until withdrawn in whole or in part by the stockholders in the way of dividends or otherwise. To the extent that the depletion sustained is not considered in determining the earned surplus, or in other words, to the extent that the earned surplus includes in part a return of the original capital invested, the invested capital is duplicated. The fact is that what is called earned surplus is in part not earnings but is part of capital returned. The statute clearly does not authorize the same investment to be included in invested capital both as paid-in capital and as earned surplus. If, however, the mine was purchased out of earned surplus, then to the extent that provision is not made for the depletion actually sustained the so-called earnings in fact include a part of the existing earned surplus, and should not be again added to invested capital. Since the passage of the Revenue Act of 1918, the regulations of the Treasury Department have provided:

Only true earned surplus and undivided profits can be included in the computation of invested capital. * * * In the computation * * * full recognition must first be given to all expenses incurred and losses sustained from the original organization of the corporation down to the taxable year. * * * There can of course be no earned surplus or undivided profits until any deficit or impairment of paid-in capital due to depletion, depreciation, expense, losses, or any other cause has been made good.

The Court of Claims in the *Cortez Oil* case, *supra*, and the Supreme Court in *Willcuts* v. *Milton Dairy Co.*, *supra*, approved the above regulation as correctly interpreting the statute. It is the contemporaneous uniform construction of the Department charged with the execution of the law and subsequent Revenue Acts have made no change in the statute in that regard.

To the extent that the earned surplus includes a return of capital in whole or in part represented by the original investment in the mining property, it is not in fact a true earned surplus and should not be added to invested capital.

The facts that under the 1909 Act no depletion was allowed as a deduction in computing net income and under the Revenue Act of 1913 only a limited amount of depletion was allowed as a deduction in determining income, have no relation to the amount of depletion actually sustained in those years, and it is the depletion actually sustained that reduces the earned surplus which is added to invested capital.

For the reasons indicated, the contention of the petitioner on this point can not be sustained, and the action of the respondent is, therefore, approved.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*